IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )          District Court
                               )          Case No.21-cr-10018
NANCY MARTIN,                  )
                Defendant.     )
_____)

TRANSCRIPT OF RESTITUTION HEARING

On the 4th day of March, 2025, came on to be heard in the proceedings in the above-entitled and numbered cause before the HONORABLE ERIC F. MELGREN, Judge of the United States District Court for the District of Kansas, sitting in Wichita, Kansas, and commencing at 1:30 p.m.  Proceedings recorded by stenomask voice writer.  Transcript produced by computer-aided transcription.

ANNIE S. STATES, CCR, CVR, RVR-M
U.S. District Court, 401 N. Market, Wichita, KS 67202
(316)315-4334

APPEARANCES

The plaintiff appeared through:

    Ms. Kathryn E. Sheedy
    Office of United States Attorney - Topeka
    444 SE Quincy
    Topeka, Kansas 66683

    Mr. Aaron Smith
    Office of United States Attorney - Wichita
    301 N. Main Street, Suite 1200
    Wichita, Kansas 67202

    Mr. Todd Shadid
    Klenda Austerman Attorneys at Law
    301 N. Main
    Wichita, Kansas 67202


The defendant appeared through:

    Mr. Branden A. Bell
    The Bell Firm, LLC
    123 W. 8th St., Suite 206
    Lawrence, Kansas 66044

LAW CLERK BODECKER:  All rise.

The United States District Court for the District of Kansas is now in session.  The Honorable Eric F. Melgren presiding.

THE COURT:  Good afternoon.  You may be seated.

The Court calls the case of the United States versus Nancy Martin, Case No. 21-10018.

Can I start with appearances, please.

MS. SHEEDY:  May it please the Court, Your Honor, Kathryn Sheedy appears for the United States.  Aaron Smith is also present.  And in the courtroom, we have Todd Shadid, who represents the nonfederal victim.

THE COURT:  All right.

MR. BELL:  Good afternoon, Your Honor.

Ms. Martin appears not but through counsel, Branden Bell.

THE COURT:  All right.  Thank you.

So, Counsel, this is in some ways a complicated case. And you-all know that I did a bunch of accounting and sent it out to you and then you-all did a whole bunch more accounting and sent it back to me.  But I think, as I have really contemplated this, our issues here are pretty straightforward.

The first issue we have to talk about is how monies collected from the state court proceeding have been allocated. And that is purely a fact question, which is to say, what was

done with them?  Not what should have been done with them, because I have no jurisdiction over the state case, thank God.

So if there are allocations made in the state court that you-all think should have been done different, this is not the place to raise that.  And, frankly, it's not the time to raise it.  It probably should have been done before.

So the first thing I want to do is see what cases -- or what monies collected from that case -- have they been allocated or how they have been allocated and, specifically, whether they have been allocated to the matters that the forfeiture judgments here cover.

If not, it seems to me that we are kind of in an anomaly situation, I think.  For whatever reasons, I mean, I kind of remember how we got here but now that we're here, I'm not sure it made sense.

We're holding all of this money to pay all these forfeiture things, but we have decided not to pay it.  So we need to address that.  We need to stop holding money.  We're not a bank.  We need to pay money to people that are owed money.

And then we need to figure out if there's a shortage or an excess, what we do with that.  And, of course, determining that shortage or that excess is going to partly determine how we answer the first question.  And, I think, unless you-all can really persuade me differently, that that's all we need to do today.  So that's how I look at where we are at with respect to

these issues.

Do any of you want to make an impassioned statement to a variance from that?

I'm seeing a noticeable lack of passion, let's proceed with that.

How do you want to start with -- and I've looked through all the stuff you-all have sent, and I think I have the most tenuous understanding on what's happened in the state court case, and Mr. Shadid may be kind of a key guy on that, but you-all can tell me how you want to proceed.  But let's start there.

What what's been done with the money collected through the state court civil lawsuit?

MR. BELL:  Your Honor, hopefully I can answer that.

As we put out in our responses, the state court issued judgments for certain amounts.  But as far as allocating the amounts, the court itself hasn't said this amount goes to satisfy this portion of the judgment or this amount goes to satisfy this portion of the judgment.

THE COURT:  But the plaintiffs have; correct?

MR. BELL:  The plaintiffs have announced how they plan to treat the money that they have received; correct.

THE COURT:  And there have been no objections filed to that?

MR. BELL:  I don't know that the plaintiffs have

stated that in state court about how they plan to treat -- or how they plan to allocate themselves where the dollars have gone. So I don't -- to answer your question, I don't think there's been an objection. I don't know that there's ever been a forum or an opportunity for anyone to make an objection.

THE COURT: So is it your position that the plaintiffs do or do not have the authority under state law to make those allocation decisions themselves?

MR. BELL: I believe under state law that they do have the authority to decide how they want to treat the money that comes in to which part of the judgment it's going to satisfy. I think that is under state law their prerogative.

THE COURT: All right.

MR. BELL: I think where we run into an issue for this Court becomes whether -- because those payments are made from the same loss and from the same injury --

THE COURT: Not exactly. I mean, there are damages awarded in the state court that were not a part of the awards in this court, thinking primarily punitive damages.

MR. BELL: That's accurate, Your Honor. I will say on -- there are not many, but the handful of cases that I was able to find where -- that are factually similar where there is punitive damages awarded in state court and a federal restitution from the criminal court, I have not seen this sort of -- I don't want to call it pejorative, but sort of moving the

ball around to say, "No, no, we're still owed compensatory damages."

The cases that I have seen the idea has been if there is damages awarded from the state court for the same loss, then those ordinarily -- again, the cases I saw it on -- factual similarities -- there would have been a reduction in the restitution.

THE COURT:  And, of course, overall there's been less money collected than has been ordered between the two courts?

MR. BELL:  There is -- all the money that this Court has ordered for restitution has been collected.  In fact, more than the amount was.

THE COURT:  I do think we're in a bit of an overage situation.

MR. BELL:  There is an unsatisfied portion of the state court judgment that would --

THE COURT:  Right.

MR. BELL:  But this Court's restitution order has been more than satisfied.

THE COURT:  And one of the things I want to do after this hearing is stop holding these monies and get them to the people that they're awarded to and try to resolve some of this complexity.

I understood that the defendant's position in this case was that some of the monies owed from this Court's order

should be deemed already partially satisfied by monies collected in the state court proceeding. But, from what I understand has happened with the monies collected in the state court proceeding -- and, as I've already confessed, I have the most tenuous grasp there -- says none of the monies collected there have been applied to the same damages awarded in the federal court because there is obviously a large overlap between what has been ordered there and what's been ordered here.

MR. BELL: Yes, Your Honor.

THE COURT: So let's talk about that.

MR. BELL: Your Honor, my understanding, and I'll trust Ms. Sheedy to correct me if I'm wrong --

THE COURT: That's because it's going to be difficult for any of us to wade into the detail that she's done and match her level of work and kind of set that aside. So right. I think neither you or I really want to take her on with that.

MR. BELL: Not me, Your Honor.

THE COURT: Right. And not me.

MR. BELL: I don't believe the -- I believe all of the money collected to the state court has been disbursed to ESPA, to the nonfederal victim.

THE COURT: They're smarter than we are. They're not hanging on to it.

MR. BELL: I don't believe that -- I don't believe they're holding on to any money waiting for it to be disbursed.

THE COURT: And as they have disbursed it, and, of course, they've disbursed it to the parties to which damages have been awarded. The question is: Which damages? As I see the issue that's before us.

MR. BELL: My review of the court's orders approving disbursements haven't distinguished or specified as to what category of damages those funds would go to satisfy.

THE COURT: But the parties there, as I'm under the impression, have indicated how they have applied those collections.

MR. BELL: I don't believe the parties, "plural," have. I believe, for the purposes of this litigation, for this motion, the nonfederal victims, or the plaintiffs in the state court suit, have declared, "We have decided that this is how we're going to allocate it." I don't believe there's been any such statement in state court or for any other purpose other than these proceedings about how they have opted to allocate those funds.

THE COURT: Okay. Ms. Sheedy.

MS. SHEEDY: Yes, Your Honor. While it's true, as far as I understand it, the state court has not reviewed the civil plaintiffs or the victims in this case -- their allocation of payments. The way that the plaintiffs have allocated those payments is consistent with state law -- not state law, I'm sorry -- case law in the state of Kansas.

So, first, the plaintiffs appear to be following the United States rule that provides a creditor first applies payments to interest, and then, once accrued interest is satisfied, then the payments are applied to principal.  So it does appear that that's what's happening in the state case.

THE COURT:  And so to the extent that the interest at question is due for damages, which have been awarded in both courts, we would still have to figure out how to handle that.

MS. SHEEDY:  Correct.  And I think that's an interesting point.  Mr. Bell referenced that cases he had reviewed where there's a state civil proceeding for damages that arise out of the same act that led to restitution, where there seems to be a dollar-for-dollar application of payments made in the civil case as credit to amounts owed in restitution -- I've reviewed those cases, and I could not find one on point with the facts of this case.

THE COURT:  There's a real paucity of authority, at least from our research, that addresses our precise puzzle.

MS. SHEEDY:  Right.  The cases I did review really had matching judgments, where the order of restitution equaled the civil judgment.  And it didn't appear that enough time had accrued, or perhaps that the judgment was such a large amount that interest accrued at such a rate where it was really worth a dispute as to the application of credit or the application of payments in the civil case.

Here, given the amount of the punitive damages plus the interest that accrued over time, it's a very stark contrast -- the facts of this case -- to any of the case law that I could locate.

THE COURT:  So tell me -- and this is not a response that I want in numbers -- but tell me how you understand the state court collections to be allocated, that is to say, to what items.  And, again, I don't want to do an accounting here -- but to what items of damages awarded and how those items of damages parallel or differ from the orders from this Court.

MS. SHEEDY:  Okay.  To start -- I know you don't want to talk about numbers, and I completely understand that as there are a lot of numbers in this.

THE COURT:  There are a lot of numbers.

MS. SHEEDY:  A lot of numbers in the most recent joint stipulation that was filed.  And you have to forgive me, numbers is my wheelhouse.

THE COURT:  We well appreciate that.

MS. SHEEDY:  And I also do realize that a lot of attorneys went to law school because they don't want to deal with numbers.

THE COURT:  It's funny you say that because I have often made that comment that law school is for smart people who don't like math go.  I had an attorney, actually a former partner of mine, really take me on in front of a jury once when

I said that sort of whimsically and tell me that he finished in the top 3 percent of his ACT test on math. And I thought, nobody cares. But I have said that before. Law school is for smart people who don't like math go. So you are the anomaly.

MS. SHEEDY: Yes. I am the exception to that rule.

I do like numbers, and I apologize for providing so many numbers to the Court.

THE COURT: So what I would like to do is have you indicate what categories the money went to and whether those categories are categories that are replicated in this Court's judgment. And if we don't have an issue with that, then we don't have to do numbers because they have been allocated to things that leave our orders unaffected.

MS. SHEEDY: Correct.

THE COURT: If they do replicate, then we'll have to get into numbers. But before we do that, let's see if we even have to.

MS. SHEEDY: Okay. I'm going to try to do this without numbers, but I was looking for dates and I don't have those quite offhand. But perhaps Mr. Smith can jump in if he remembers the dates specifically.

THE COURT: I see Aaron quietly sitting there not wanting to wade into this mathematical discussion.

MS. SHEEDY: The restitution that was ordered in the criminal case was meant to represent loss amounts that

Ms. Martin embezzled during a specific period of time.

THE COURT:  Loss amounts as to two victims?

MS. SHEEDY:  Correct.  And there's only one nonfederal victim in the federal case, ESPA.  Because the other victim --

THE COURT:  Right.

MS. SHEEDY:  -- assigned its loss to ESPA.  So there's two plaintiffs in the civil case; one victim in the criminal case.  But it's all for the same acts.

THE COURT:  One of the plaintiffs in the civil case is the victim in the federal case?

MS. SHEEDY:  That's correct.

THE COURT:  And then our other, so to speak, victim in the federal case is the IRS?

MS. SHEEDY:  Correct.

THE COURT:  Although, the IRS usually creates victims.  It doesn't suffer.  But, nevertheless, they are owed money in this case.

MS. SHEEDY:  Okay.  I won't respond to that comment.  We will move on.

The difference between the civil judgment and the criminal restitution is that the civil judgment included amounts that were embezzled during a time period that was not included during the time period for the loss calculated in the criminal case.

THE COURT:  Right.

MS. SHEEDY:  So the amount embezzled was greater in the civil case.  Additionally, the civil case included investigation costs, as of the date the lawsuit was commenced, that was not included in the criminal restitution.

THE COURT:  It is not a large amount, but that was a factor.

MS. SHEEDY:  Correct.  And it also included prejudgment interest which was not included in the loss amount in the criminal case.

THE COURT:  All right.  Let me stop and think about that for a second.  So my judgment only accrues interest after it is ordered?

MS. SHEEDY:  Correct.  Post-petition interest.

THE COURT:  But the civil case included prejudgment interest?

MS. SHEEDY:  Yes.

THE COURT:  All right.  Right.  Gotcha.  I'm with you.

MS. SHEEDY:  So the payments in the civil case, per the United States rule, were first applied to court costs.  That was only about $2,900.  And then after that, all amounts received -- which were not voluntary payments -- but all amounts recovered by the civil plaintiffs were applied to interest because the amount of interest that had accrued post-petition on the civil judgment was so large that interest could not be satisfied by the amount covered; so there was nothing to apply

to the principal balance of the judgment.

THE COURT:  So the question is:  Was it applied to prejudgment interest or post-judgment interest?

MS. SHEEDY:  It was applied to prejudgment interest.

THE COURT:  And was the application of those funds to prejudgment interest insufficient to fully satisfy that amount?

MS. SHEEDY:  Yes.

THE COURT:  All right.  And so that's the end of the story?

MS. SHEEDY:  From my viewpoint it is.

THE COURT:  Court costs -- so you say "court costs." That doesn't include investigative costs.  There was also application of investigative costs, wasn't there?

MS. SHEEDY:  So investigative costs were lumped into the actual damages portion of the civil judgment.

THE COURT:  So there wasn't a separate award for that?

MS. SHEEDY:  Correct.

THE COURT:  Okay.  All right.

So the payments collected from the state court judgment were applied first to whatever de minimis amount of court costs.  I see Mr. Shadid back there nodding his head vigorously this way.  So I have a feeling if he differed with you, we would be hearing from him.

MS. SHEEDY:  I agree.

THE COURT:  We applied whatever de minimis amount,

particularly to the context of the money that we are talking about, to court costs, and then to prejudgment interest. And there was no money beyond that to apply to anything else?

MS. SHEEDY: That's correct.

THE COURT: And none of those are awarded -- or duplicative of amounts awarded in the criminal case?

MS. SHEEDY: That's correct.

THE COURT: Mr. Bell, what do you say about that?

MR. BELL: Well, Your Honor, I've been looking through the state court judgment, and I don't see that it authorizes prejudgment interest. And I'm looking specifically at Doc. 291-3, which was one of the exhibits to our joint stipulation.

THE COURT: Ms. Sheedy.

MS. SHEEDY: Your Honor, the state court judgment mirrored the numbers that were listed in the civil plaintiffs' third amended petition that did itemize the loss amounts and prejudgment interest.

And if you will take a look at Document 291, the exhibit attached to that document -- the declaration of Todd Shadid. On the very first page there is a copy and paste of that third amended petition that shows exactly what was included in the actual damages.

THE COURT: So that amount shows with respect to MKWS -- is that a K or an X?

MS. SHEEDY: It is a K.

THE COURT:  Thank you.

Embezzlement in round figures of $737,000; '06 to '08. And then embezzlement '08 through '11 of $1,200,000.  But prejudgment interest on the first amount of $460,000 and on the second amount of $571,000.  My math tells me that the total of those two prejudgment entries is $1,031,807.

And then the last figure is unreimbursed embezzlement plus interest.  I don't know what to do with that.  So these figures, then, you are saying were carried over wholesale to the state court judgment?

MS. SHEEDY:  That's correct.  Because it was a default judgment.

THE COURT:  So Mr. Shadid's declaration goes on to say in paragraph 7, there's been a recovery of $1,211,000 applied to cover costs of $2,950, and then it says of $1,208,000 in prejudgment interest.  But I don't know where that 1,208,000 figure comes from because, as I have noted, when I total the two prejudgment interest figures on the front page of Mr. Shadid's declaration, they total only $1,031,000.  And I couldn't find that $1,208,000 figure.

MS. SHEEDY:  I think it's because the number, as you noted just a minute ago on unreimbursed embezzlement to ESPA, lumped in prejudgment interest with the embezzlement amounts. That's how it was styled in the third petition -- third amended petition.

THE COURT:  So how do I know how much interest is lumped in?

MS. SHEEDY:  I believe we noted that within this declaration.  And I will just have to look through this because I had that question as well, and Mr. Shadid and I discussed it.  He did provide numbers to me on exactly how much interest -- prejudgment interest was included.

THE COURT:  So, just before we pursue that issue to wrap up the last one, page 1 of his declaration has a total of $6,265,000, et cetera.  That's the amount that's replicated in the state court judgment?

MS. SHEEDY:  Correct.  But I will note for the Court -- and this is referenced somewhere in the declaration -- that there was a $60 math error there.  And so, probably not enough to make any difference, but in the Excel spreadsheet that was also attached as an exhibit to this declaration, we had modified the total amount of the judgment to make it correct.

So basically, we added up the itemized numbers and ignored the total that was off by $60.

THE COURT:  So we verified that the $6,200,000 figure on the front page of Mr. Shadid's declaration is the amount of the state court judgment.  We're now trying to identify the $1,208,000 prejudgment interest figure because it is not quite $200,000 more than the prejudgment interest that's identified on page 1?

MS. SHEEDY:  Correct.  And, Your Honor, if you will look at the declaration of Todd Shadid on page 3.

THE COURT:  I have made a lot of highlights on that.

MS. SHEEDY:  There's a table.  And at the top it goes through --

THE COURT:  Okay.  And that one shows three amounts for prejudgment interest.  The $460,000 and the $571,000 that were on the front page, and then there's a final figure of $372,000 not identified on the front page.

MS. SHEEDY:  Correct.

THE COURT:  And those three figures total $1,404,000 and change.

MS. SHEEDY:  And then keep going down because then you have the actual damages suffered by ESPA.

THE COURT:  And there is prejudgment interest of $139,000 there.  And if I add that in, it totals $1,543,000 in prejudgment interest.

MS. SHEEDY:  Correct.

THE COURT:  So tell me where that $372,000 figure and that $139,000 figure prejudgment interest comes from.

MS. SHEEDY:  That comes from information that Todd Shadid provided, because in the third amended petition, it did not break out those amounts.  So on the front page of the declaration, it shows unreimbursed embezzlement from 2012 through 2017 plus interest.

THE COURT:  Right.  That $707,000 figure.

MS. SHEEDY:  So it's breaking down that number as provided by Todd Shadid's records.  And then if you go down --

THE COURT:  And then the same thing under ESPA -- unreimbursed embezzlement plus interest of $913,000.

MS. SHEEDY:  Correct.

THE COURT:  So on page 3 -- this I did not total.  You can tell I've done a little bit of math.  Under ESPA -- is that $774,000 figure and $139,000 figure, do those two total to the $913,000 on page 1?

MS. SHEEDY:  They should.  But, Your Honor, I'd be happy to add it up really quick, if I can pull out my calculator?

THE COURT:  I'm just doing it roughly in my head.  It looks like they do.

MS. SHEEDY:  They should.

THE COURT:  And then above that, $334,000 and the $372,000, do they total the $707,000?

MS. SHEEDY:  No.  Those --

THE COURT:  No, they don't.  So you see the figures I'm talking about?

Unreimbursed embezzlement '12 through '17, $334,000; prejudgment interest, $372,000.  Yeah.  They do total the $707,000.  I mean, I'm not doing it exactly, but it looks like they total the $707,000.

MS. SHEEDY:  Yes, I agree.

THE COURT:  Okay.  All right.  So what you are telling me is that on page 3, we have a total of $1,543,625 in prejudgment interest?

MS. SHEEDY:  Yes.

THE COURT:  And so the $1,208,000 figure I questioned on page 2, that figure is merely the amount of recovery minus the court costs of $2,950?

MS. SHEEDY:  Correct.

THE COURT:  And you're saying that $1,208,000 has been applied to offset the prejudgment interest amount of $1,543,000, et cetera?

MS. SHEEDY:  Right.  Which leaves approximately $335,000 of prejudgment interest unpaid.

THE COURT:  Before principal or post-interest is addressed?

MS. SHEEDY:  Correct.

THE COURT:  I'm astonished, but I think I understand this.  All right.

So, Mr. Bell, what do you have to say about all of this?

MR. BELL:  Well, I'm certainly not going to argue with Ms. Sheedy about numbers -- or the Court.

THE COURT:  That's probably a wise -- well, I'm not going to argue with her about numbers either, but I at least

have kind of figured out where she's at.  As I said, I did do some totaling on this sheet before today.

MR. BELL:  Your Honor, again, I don't dispute any of the calculations that you've gone through with Ms. Sheedy.

On the broader point, the nonfederal victims in this case have recovered a substantial amount of money.  This Court has ordered restitution for the same injury to that same nonfederal victim.

I understand that the judgments do not perfectly overlap, but there's no way -- I am not aware, I should say, of any similar mechanism in state court that would require that court to give credit for the federal restitution that it will -- the nonfederal victim will receive as part of this --

THE COURT:  So your concern now is the flip side of what we're talking about here, which is after application of funds that we hold are applied to the restitution order, how does the state court judgment give credit to that payment of funds?

MR. BELL:  Correct, Your Honor.

THE COURT:  I can't answer that question.  It's a good question.  It's a valid question.  It seems to me, in the interest of judgment, the state court should.  But I am not the state court.

MR. BELL:  I understand, Your Honor.  It's a complicated situation with -- I don't want to call them dueling

judgments, but judgments that are for -- to compensate for the same loss, although in different categories.

You did mention something that made me -- drew my interest.

THE COURT:  Prejudgment interest?

MR. BELL:  Post-judgment interest, actually.  It's a riveting post-judgment interest.

It seems that it will be duplicative for the nonfederal victims to collect post-judgment interest in the state court and as part of this Court's restitution order.

So perhaps -- it's not a perfect answer -- but perhaps the fairest thing to do is to modify this Court's restitution order to reduce or eliminate the interest on the restitution.

THE COURT:  I don't think that's legally even an option that I have.  I think what should happen, in the interest of fairness, if I were the state court judge -- which I have made clear that I am not -- is that once we satisfy the full restitution order that this Court has issued, that will include interest that's accrued from the date the principal amounts were ordered.

And the state court should then, it seems to me, accordingly say, "Well, we're going to reduce the principal owed under our judgment by the amounts recovered under the criminal judgment, and we are going to reduce those as of the date of judgment to not calculate interest for it."  And if I were you,

I would file a motion asking the state court to do that.

But I don't think I can address -- first of all, I don't think legally I can do that.  Well, actually, that may not be true.  I think I might be able to waive interest, but I'm not willing to do that, not on these amounts.  And I certainly don't think I can take action on the assumption that the state court is going to do things wrong -- wrong at equity, if not at law.

So my inclination, Mr. Bell, is to say that I'm going to order all the funds that we are holding apply to all the judgment that I've entered in this case without reduction, because I think the monies collected in the state court have gone to matters -- have been allocated to matters that I did not order.  And I don't think that allocation was wrong; I'm not sure I would say that it was correct.  I don't know that I have got the authority to do that, but I don't think it was incorrect.

So given that, I think my inclination is to order payment of all the funds that we're holding, and I really regret now that we held them, but life's full of regrets -- unless you're Frank Sinatra.  I think I should order all the money that we're holding to be paid to all the judgments I've issued without reduction from state court collections, for the reasons I have just mentioned.  And then we need to address what the overage/underage is and how we address that.

So that's where I'm at, at this point.  And if you

want to make objections to that, I'll certainly receive them. Unless they're persuasive in ways I haven't heard yet, I will probably will overrule them. But I certainly will allow you to make any objections to my tentative ruling in that case before we proceed.

MR. BELL: Yeah. I don't have any objections other than it has already been -- the arguments have already been filed.

THE COURT: Okay.

MR. BELL: I understand the Court's ruling. It's a close case. I think reasonable people can disagree about it.

I think going forward what I would propose, as long as Ms. Sheedy finds it acceptable, is once the Court does order the amounts held paid to the victims, if there is an overage, I think Ms. Sheedy and I can -- once we figure out what it is, I think we can likely stipulate as to what should happen with that amount.

THE COURT: And that's where I want to move next. And I have two questions on that.

And I am guessing, Ms. Sheedy, you are going to have rough ideas on that.

First of all, I have a very vague and inchoate sense that we have a little bit more money held than is due to be paid.

MS. SHEEDY: No, Your Honor. If you deny Mr. Bell's

motion to allow credit and the funds on hand are paid out, we should end up exactly where we need to be.  And I'm happy to explain that further.

THE COURT:  Can I just take your word for it?

MS. SHEEDY:  If you're comfortable with that.

MR. BELL:  Yes.

THE COURT:  I talked with our folks, and I have too much paperwork up here, but my sense was that we had a few thousand dollars -- because I'm not entirely sure that the interest that we were accruing on funds invested was a perfect match to the interest accruing on judgments ordered.  They would have to be identical.

And our interest on judgments ordered were fixed, but our interest on funds held was variable.  So I didn't think they were always the same amount.  And my impression was that there was a few thousand dollars delta between those two, in the favor of an overpayment.

MS. SHEEDY:  I think I understand where you are coming from.  I wouldn't classify that as an overpayment because I think that was our intention in having the court clerk invest the money when knew -- the money that, at least the Government contended would be payable to the nonfederal victim.  And so the idea was that it would accrue interest while in the CRIS account.

THE COURT:  And it did.

MS. SHEEDY:  It did.

THE COURT:  But I don't think it accrued -- because the judgment -- the interest that was -- the post-judgment interest was set at a fixed amount.  Whatever the interest rate was as of the date of judgment, that was the fixed amount of interest that accrued on that judgment, and I don't know what that number is, but that's correct so far; right?  Whatever that number is?

MS. SHEEDY:  Right.

THE COURT:  But the funds invested with CRIS did not accrue interest at a fixed amount.  They accrued at a variable amount.  And so that's going to create some delta between those two funds -- or those two sums.

MS. SHEEDY:  Well, can I start at the beginning, Your Honor?

THE COURT:  Okay.

MS. SHEEDY:  Because I would like to backup a step.

THE COURT:  Okay.

MS. SHEEDY:  The amount that was deposited into CRIS for the nonfederal victim was $3,024,000 and change.  That number represents the amount of restitution you ordered to the nonfederal victim plus interest that had accrued and was payable to the nonfederal victim.

THE COURT:  Right.

MS. SHEEDY:  And then, per your order and our agreement, that full amount was deposited in the CRIS account to further accrue interest with the intention of compensating the nonfederal victim for the delay because --

THE COURT:  So had we paid them -- paid that judgment on that date that we invested in CRIS, it would have balanced out evenly?

MS. SHEEDY:  Correct.

THE COURT:  But my point is, we didn't pay them, and my order accrued interest at a fixed rate, and the CRIS account earned interest at a variable rate; and so there grew some difference between those figures.  And this is why I said earlier I regret now that we did this, but we did it.  There grew some variable -- some delta between those two sums because different interest rates were being applied.

MS. SHEEDY:  I understand where you're coming from.

THE COURT:  I mean, is that not correct?

MS. SHEEDY:  Yeah.  I think there are two different interest amounts.  One was interest on the judgment.

THE COURT:  Which is fixed.

MS. SHEEDY:  Which is fixed.  And then another is interest on the investment.

THE COURT:  Which is variable.

MS. SHEEDY:  Which was variable.  I think the easiest way to resolve that is for you just to enter an order saying

this $177,000 that accrued as of January 28th is paid to the victims.

THE COURT:  What is the $177,000?  Where did that figure come from?

MS. SHEEDY:  That came from the court clerk's office. I had requested the amount of interest that had accrued on the funds deposited in the CRIS account and it came out to $177,027.48 as of January 28th, 2025.

THE COURT:  Well -- but that's the interest that it accrued on CRIS?

MS. SHEEDY:  Yes.

THE COURT:  What's the interest that accrued on the judgment?

MS. SHEEDY:  The interest that accrued on the judgment was locked in at $115,999.71.  Interest stopped accruing on the judgment as of the date the judgment was paid in full.

THE COURT:  The judgment was never paid in full.  And I had this discussion with you and with --

MS. SHEEDY:  Jason.

THE COURT:  Jason.  That your computer calculations treated it is as paid in full because we had enough money to pay it, but, in fact, we didn't pay it.  And so the victims are entitled -- because they've not been paid -- the victims are entitled to the judgment ordered plus the statutory interest that's accrued since the date of judgment.

And I know that it showed that we're not accruing interest anymore because there's money to pay it.  But the fact of the matter is, we didn't pay it.  And so interest on behalf of the debtor -- I'm sorry -- on behalf of the creditor, continues to accrue until paid, even though your systems don't calculate it.

MS. SHEEDY:  I believe I understand what you are saying, and I respectfully disagree.  And I really hate to argue against victims as essentially an advocate for victims.  I want the victims to be fully compensated for their loss, but I don't think that the statute supports your conclusions there.

I would ask that you take a look at 18, United States Code, 3612, subsection c, which states, "Any money received from a defendant shall be disbursed so that each of the following obligations is paid in full in the following sequence."

One is a penalty assessment under Section 303 -- I'm sorry -- 3013.  Two, restitution of all victims.  And then, three, is all of their fines, penalties, costs, and other payments.

That, read in conjunction with subsection (i) of the same statute, which is application of payments -- "Payments relating to fines and restitution shall be applied in the following order:  One, to principal; two, to costs; three, to interest; and four, to penalties."

What stands out to me is this statute focuses on

application of payments.  So when the money comes in, how the payments are applied.  And that's what the clerk's office does.  When a payment comes in, it is applied to the judgment amount.

THE COURT:  So when you use the word "payment," do you mean payment from the debtor, or do you mean payment to the creditor?  Because they're different payments.

MS. SHEEDY:  They are.  My office and the clerk's office -- which is consistent with the nationwide accounting of criminal monetary penalties -- focuses on the payment from the defendant to the court.

THE COURT:  But that's because what we did here was aberrational.  We received but did not disburse money.  And the statute you read talked about disbursements.  We did not disburse the funds.

MS. SHEEDY:  Right.  But we applied the payments -- or the court did.  The clerk's office applied the payments to the outstanding judgment.

THE COURT:  Well, they did that, but I don't think appropriately so because the victim did not recover those amounts.  I think it's unfair to the victim to say we decided to hold your money for a year and now we're going to pay it to you as if we didn't hold it to you for a year and you are out the time value of money.

MS. SHEEDY:  Yeah.  Which is exactly why we invested the funds in the CRIS account.

THE COURT:  Well, you invested -- no, no -- we invested in the CRIS account to help close that gap.  But that doesn't mean we can just pretend like none of it happened.

MS. SHEEDY:  Right, Your Honor.  But what you are requesting would be a deviation from how all criminal monetary penalties are handled across the nation.

THE COURT:  Well, no.  We've already made that deviation.  We already made that deviation by collecting and not disbursing funds.  And I've already said I regret having done that, but we did it.  That's the deviation.

But having made that deviation, the victims should not be required to bear the costs -- the loss of time value of money, because we elected to collect but not disburse those funds.

MS. SHEEDY:  Yes, Your Honor.  But that happens in every single case because the clerk's office only disburses quarterly.

THE COURT:  How long have we held this money?

MS. SHEEDY:  Well, we've held it for over a year.

THE COURT:  So that's the aberrational part.

MS. SHEEDY:  Right.  But I'm concerned that if you entered an order saying that the victims in this case are entitled to restitution until payment, that order would apply to other cases.  And I don't know how the United States and the court could possibly account for that because there's always a

delay between receipt of funds and disbursements to victims.

THE COURT:  But not a delay of the magnitude we did here.

MS. SHEEDY:  Sometimes there is because, for example, when a payment is received from the Treasury Offset Program, the court clerk is required per their own judiciary guidelines to hold those funds for six months.  And the reason for holding those funds is that there's a possibility that perhaps, depending on where the funds come from -- what payment was offset by the United States treasury -- it's possible that, in the event of a tax refund, a spouse of the defendant who owes the money might file a claim for injured spouse and receive a refund of that money.

When that happens, the top payment is reversed and automatically -- I guess the way I envision it, which is not the appropriate way -- it's just sucked back out of the clerk's office account.  So that would put the clerk's office in a deficit if it immediately disbursed money.

Also, it has to make sure that the payments clear.  So there's always a delay between receipt of a payment and disbursement.  Sometimes my office and the clerk's office will communicate and say, "Hey, there's something pending in this case.  There's a chance that this restitution order might be corrected, modified, appealed."  These funds should not be disbursed to the victim because that puts the court clerk in an

untenable position where their account might go into the negative.  And it's my understanding that the court clerk becomes personally liable for any amounts that are paid in error.

THE COURT:  So I was talking to Mr. Bell earlier and was saying that I didn't have authority to waive interest, when I realized that I do.

So I think what I have the authority to do is to say the -- thinking about this as a banker -- which, by the way, I never was -- but I think I have the authority to say, time value of money notwithstanding, you are not going to collect the full interest compounded daily -- time value of your money -- when we pay this out because of how we calculate it.

So if we have collected and earned on an investment less money than you would be entitled to on a daily accrual of the interest at the fixed rate, I'm waiving that difference.  I think I have the authority to do that.  But if I have more money that's collected, I'm not sure I have the authority to pay the additional amount to the victim.

So that brings me back to my threshold question which is:  Given that delta between the variable interest earned on the CRIS account and the interest accrued at the fixed rate on the judgment -- that they won't balance equally -- which side does the difference fall?

MS. SHEEDY:  Well, Your Honor, I haven't calculated

that number, but I think you may have previously when you entered the order that was docketed as Document No. 289.

You have a number on your attachment -- the federal court's order of restitution where you had calculated plus interest accrued on unpaid victim restitution at $273,574.

THE COURT:  Right.

MS. SHEEDY:  Well, if you add -- and I need a calculator for this -- the actual interest that accrued, which was $115,099.71, and you take that away from the 270 --

THE COURT:  Well, see, I actually used an interest accrued amount towards the bottom of $177,000 where my footnote 8 is.

MS. SHEEDY:  I believe that's the number you received from the court clerk on the interest that accrued on the funds in the CRIS account.

THE COURT:  So, I think, if I'm looking at my own sheet -- and because I'm the one that calculated these, I implicitly distrust these numbers -- as I look at my own sheet, it looks like the interest due to the victims was $273,000; where is, the interest earned on our investments was $177,000. So we are roughly $95,000 short.

MS. SHEEDY:  I don't think -- I think you need more involved in that calculation.

THE COURT:  I'm certain I do.

MS. SHEEDY:  Because you have to remember that the

funds that were deposited in the CRIS account already included $115,000 in post-judgment interest payable to the nonfederal victim.  Wait -- I'm sorry -- that number might not be right. No.  I'm sorry.  That's not the correct number because we gave credit.  It's $106,301 of post-judgment interest that had accrued.

THE COURT:  So, again, without doing math, is the payment to the victim going to overpay them or underpay them? Because I think I have the authority to underpay them by waiving interest.  I don't know if I have the authority to overpay them. And if not, then we need to figure out what to do with that overpayment.

MS. SHEEDY:  I guess I struggle with answering that question, because I still disagree with your fundamental calculation of the interest, because I see the interest that was earned in the CRIS account as a completely separate and unrelated interest amount to interest that accrued on the judgment.

THE COURT:  I agree with that.  They are separate amounts.

MS. SHEEDY:  But can we not just pay it to the victims?

THE COURT:  Well, but -- I mean, that logic would say if we had collected an extra $700,000, we could just pay that to the victim too.  Why don't we just pay it to the victim?  I

don't think I can pay the victim more than they're owed.  And the victim is owed my amount of restitution plus interest at the fixed amount.  That's by law what the victim is owed.

And I can't just say, "Oh, we have collected lots extra.  Here, we're going to give that to you as well."  And I particularly can't do that when the defendant in the criminal case owes money under a separate issue and has a claim that the excess money should be applied there instead of us just giving it to the victim for no -- I don't think I have the authority to do that.

I know that we invested the money to try to offset those differences, but, at the end of the day, my judgment was you're owed this amount of restitution at this fixed rate of interest, and that's going to total some sum.  And if I have more money than that, I am not sure I have legal authority to just give that excess to the victim.

MS. SHEEDY:  Well, then, Your Honor, I'm starting to agree with you that we never should have invested this money in the first place.

THE COURT:  Yeah.  I clearly came to that position. But the fact of the matter is we did.  So we have to now live with our mistakes, which is what I tell my children.

MS. SHEEDY:  So if we go down this path where that $177,000 in accrued interest is not paid to the victims, who gets it?

THE COURT:  Well, if you recall at the beginning of this hearing, I said that's a question we have to address.  So here's what I'm going to suggest.  I'm going to ask you -- I'm sorry -- Mr. Bell, would you like to be heard?

MR. BELL:  Briefly.  I think that maybe a suggestion would be that -- I mean, card is on the table.  The idea was always Ms. Martin was going to pay the full amount of restitution and the interest, and it would be invested with the idea that whatever was made on the investment would go to satisfy that interest judgment, just so that she did not continue to rack up interest penalties.

So we wouldn't have any objection to the Court entering a modified restitution order where we figured out what the total interest would be minus what interest she paid, and then have a judgment order that has that amount on it.

I think that is going to leave about a $10,000 excess somewhere -- just my back of the envelope calculations here.  I think the Court is right that they can't order more money to go to the victims than what the Court's restitution order was.

I think what I would suggest in that case is that the amount gets returned to Ms. Martin, which is something we already did once when there was an overpayment because one of the garnishees didn't withhold taxes and it created a --

THE COURT:  It wasn't really returned to her.  It was paid to the IRS to account for the taxes that should have been

withheld on the liquidation of her IRA.  It would actually go back to her.

MR. BELL:  Correct.  Yeah.  I don't know what else the Court could do with it.

THE COURT:  There are so many things about this case that puzzle me, and that's one of them.

MR. BELL:  I'm just not aware of any statutory authority for the Court to do anything other than return the over-collected amount.

THE COURT:  And it may be that returning that to Ms. Martin would be subject to some lien from the state court. I don't know.  But it seemed to me that that's the most likely resolution of this.  Again, if our amounts differ in the fact that the victims are underpaid -- to speak as a banker -- I've got the authority to waive interest.  I don't know that I have the authority to say, "Here's the amount of your judgment plus interest.  We have extra money.  Why don't you just take it too."  I don't think I have legal authority to do that.

MR. BELL:  I try never to tell a court that it can't do something, but I don't know that the Court has that authority either.

MS. SHEEDY:  Your Honor, I would have to research it a bit further to determine whether or not you have that authority.

I guess my thought is you already entered an order with the intention of putting this money in an interest-bearing

account for the benefit of the victims.  That order was entered over a year ago.  Nobody objected.  Nobody appealed it.

Can we -- wrong or not -- I mean, I know that this Court doesn't want to enter unlawful orders, but it was ordered. And, in a way, the United States and the victims relied on that order because we knew that these funds were sitting in an interest-bearing account designed to compensate the victims for the delay in payment.  And had we not known -- had we known that it would take over a year to get to this point, where we are reaching final resolution, probably would not have agreed to that in the first place.  We would have been pushing -- or the United States would have been pushing for an immediate resolution of that issue.

THE COURT:  So, Ms. Sheedy, the law is clear that a court's orders are interpreted by what they said and not by what they intended.  So whether your statement of intention is accurate or not, is legally irrelevant.  My orders -- a court's orders are interpreted by what they say.

Here's what I want you to do.  I want you to calculate, based on the interest, the fixed rate of interest ordered on the judgment at the time we entered the judgment, and to give me an amount of what that would be as of Friday.

MS. SHEEDY:  As of this coming Friday?

THE COURT:  Yes.  Not last Friday.  This coming Friday.

And then I want you to draft an order for me ordering the clerk of the court to pay that amount to the victims -- to the extent that the clerk has less money than that amount would be -- then I will enter an order waiving interest.

To the extent that the Court has more money than that amount would be, we will direct the clerk to retain that excess funds, and I will hear from the parties as to how we should treat that money.

MS. SHEEDY:  Okay.  Your Honor, that makes sense.  I think that would accomplish a quick payment to the victims.

THE COURT:  Which is primarily what I want to accomplish; right?

MS. SHEEDY:  Okay.

THE COURT:  And then to the extent that there's an issue -- and, again, if we are short, then you should probably include in the draft order that the Court waives interest to the extent that we are short, because I have the authority to do that.

To the extent that we are long, then we will let the clerk keep that small delta in the CRIS account, and then we can discuss further what to do with that.  I'm inclined to think that Mr. Bell is right.  That I need to order it returned to Ms. Martin.  I'm inclined to think that the state court creditors may want to file a lien against that.

Again, that is a state court case.  But we're still

hypothetical on whether we are long or short at this point.  I don't know that we can really resolve it.  This will at least get the ball moving, rectify our mistake of a year ago to hold this money, get that money to the victims, and then we will see where we are at after that dust has cleared.

MS. SHEEDY:  And, Your Honor, would you be comfortable with including some language in this proposed order that essentially acknowledges that we are doing this unusual order because of the prior order and it shouldn't necessarily be applied universally to other cases?

THE COURT:  Sure.  The Court acknowledges it made a mistake and we promise to never do it again.

MS. SHEEDY:  Thank you.

THE COURT:  Is that way of proceeding acceptable to both parties?

MR. BELL:  That makes sense, Your Honor.

MS. SHEEDY:  Yes, Your Honor.

THE COURT:  If you could prepare that and submit it to me.  What I would like you to do is calculate it through Friday, but give me the order a day or two earlier -- so we have time to kind of make that process -- but make the calculations through Friday.  And then we'll see where we're at at that point and address what issues may remain then.

MS. SHEEDY:  Sounds good.  Thank you, Your Honor.

MR. BELL:  Thank you, Your Honor.

MS. SHEEDY:  Thank you-all.  We're in recess.

LAW CLERK BODECKER:  All rise.

(The proceedings were concluded at 2:28 PM)

C E R T I F I C A T E

I, Annie S. States, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place as a stenomask voice writer;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true, and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 12th day of September, 2025.


/s/ Annie S. States
Annie S. States, CCR, CVR, RVR-M
United States Court Reporter